**THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DOROTHY BLAKEY, | ) | |
| Plaintiff | ) | |
| | ) | Civil Action No. 09-1661 |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | Judge Nora Barry Fischer |
| Commissioner of Social Security, | ) | |
| Defendant | ) | |


## MEMORANDUM OPINION


## I. INTRODUCTION

Dorothy Blakey ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1318-1383 ("Act"). This matter comes before the Court on cross-motions for summary judgment filed by the parties pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Docket Nos. 10-13). The record has been developed at the administrative level. For the following reasons, the Court finds that the decision of the Administrative Law Judge ("ALJ") is only partially supported by substantial evidence. Therefore, Plaintiff's Motion for Summary Judgment is GRANTED, Defendant's Motion for Summary Judgment is DENIED, and the matter is REMANDED.

## II. PROCEDURAL HISTORY

Plaintiff filed for SSI benefits on March 16, 2005, claiming disability as of November 2, 2002.[1] (R. at 35, 52).  Benefits were initially denied on August 5, 2005, and an administrative hearing was held on May 22, 2007. (R. at 21, 30, 370).  Plaintiff was found not disabled and denied SSI on September 12, 2007, in an opinion issued by the ALJ, Michael Colligan. (R. at 8-10).  The administrative Appeals Council denied a request for review on October 22, 2009, thereby making the decision of the ALJ the final decision of the Commissioner. (R. at 4-6).

The instant action was initiated by Plaintiff filing his Complaint in this Court on December 18, 2009, pursuant to 42 U.S.C. § 405(g). (*Id.*; Docket No. 3).  Plaintiff's Motion for Summary Judgment and accompanying Brief were filed April 19, 2010. (Docket Nos. 10, 11).  Defendant's Motion for Summary Judgment and accompanying Brief were filed May 13, 2010. (Docket Nos. 12, 13).

## III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decisions on disability claims is provided by statute. 42 U.S.C. §§ 405(g)[2] and 1383(c)(3)[3]. Section 405(g) permits a district court to review

---

[1]

Citations to Docket No. 8, 8-1, the Record, *hereinafter*, "R. at ___."

[2]

Section 405(g) provides in pertinent part:
> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[3]

Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing

transcripts and records upon which a determination of the Commissioner is based. When reviewing a decision denying SSI, the district court's role is limited to determining whether substantial evidence exists in the record to support the ALJ's findings of fact. *Burns v. Barnhart,* 312 F.3d 113, 118 (3d Cir. 2002). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate." *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)(quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). Additionally, if the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390.

A district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh evidence of record. *Palmer v. Apfel*, 995 F.Supp. 549, 552 (E.D. Pa. 1998); *see also Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d. Cir. 1986) ("even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings."). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. *See* 5 U.S.C. §706.

To be eligible for social security benefits under the Act, a claimant must demonstrate that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last

under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

for a continuous period of at least 12 months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986).

The ALJ must utilize a five-step sequential analysis when evaluating the disability status of each claimant. 20 C.F.R. §416.920. The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., pt. 404 subpt. P., appx. 1 (*see* 20 C.F.R. §§416.920(d), 416.925, 416.926); (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §416.920(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003).

If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given plaintiffs's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

## IV. STATEMENT OF FACTS

### A. General Background

Plaintiff was born March 25, 1960, and was forty-five years old when she filed her application for SSI. (R. at 35). At the time of application, Plaintiff lived in McKeesport, Pennsylvania. (*Id.* at 36). At the time of the administrative hearing, however, Plaintiff lived with her daughter and granddaughter in Uniontown, Pennsylvania, because a fire destroyed her apartment in McKeesport. (*Id.* at 266). Plaintiff is a high school graduate. (*Id.* at 67). She last worked in a fast

food restaurant for six months in 1994. (*Id.* at 56). Plaintiff is currently unemployed, but she cares for her granddaughter during the day.(*Id.*). In addition, Plaintiff filed for, and was denied, SSI benefits on at least three prior occasions. (*Id.* at 53).

### B. Medical Background - Physical

On April 19, 2005, Plaintiff visited Habib Abdelmassieh, M.D. for an evaluation of neck, shoulder, and elbow pain. (*Id.* at 173). Plaintiff claims her pain began in 1997 after a car accident. (*Id.*). Plaintiff reported that in 1998 she had an MRI of her left shoulder which showed a rotator cuff tear. (*Id.*). Dr. Abdelmassieh indicated that a recent left shoulder and elbow x-ray showed no abnormalities. (*Id.*). Earlier acupuncture, cortisone injections, and physical therapy did not appear to alleviate Plaintiff's pain. (*Id.*). Plaintiff reported to Dr. Abdelmassieh that her pain was a 10, on a scale of 0-10, that it was constant, and that it prevented her from caring for herself. (*Id.* at 174). Plaintiff also told the doctor that she did not smoke and only drank occasionally. (*Id.*).

During physical examination, Dr. Abdelmassieh found that Plaintiff's range of motion was limited and she could not raise her arm above her head, but was otherwise normal and showed no signs of muscle atrophy, swelling, distortion, or other abnormality. (*Id.*). Plaintiff reportedly had extreme pain reactions to certain movements and tests done by the doctor during examination. (*Id.*). Dr. Abdelmassieh determined that Plaintiff's claims of pain were out of proportion to the findings of the physical examination, and that Plaintiff's muscle weakness was non-physiological. (*Id.* at 174-75). He prescribed a course of physical therapy to maintain range of motion and manage pain, but felt narcotics for pain would be inappropriate. (*Id.* at 175).

On May 10, 2005, Plaintiff returned to see Dr. Abdelmassieh for a follow-up examination.

In the interim, Plaintiff had an MRI of her shoulder which showed tendinopathy[4], but no rotator cuff tears. (*Id.* at 171). Some mild atrophy of the left forearm muscles was noted, but otherwise Plaintiff's condition was the same. (*Id.* at 172). Dr. Abdelmassieh felt Plaintiff suffered from supraspinatus and infraspinatus tendonopathies, acromio clavicular joint arthritis, and possibly medial epicondylitis[5]. (*Id.*).

Plaintiff was admitted to UPMC McKeesport on April 25, 2005. (*Id.* at 101). Hospital records indicate that Plaintiff had passed out, and listed her condition as recurrent syncope[6] with questionable etiology. (*Id.*). Although Plaintiff had initially denied drug use when admitted, urine tests revealed the presence of marijuana and cocaine. (*Id.* at 102). In her Discharge Summary, Plaintiff was diagnosed with syncope, gastritis, depression and anxiety, substance abuse, rotator cuff

---

[4]
"Doctors may use different terms to describe a tendon injury. Tendinitis: This actually means "inflammation of the tendon." Tendinosis: This refers to tiny tears in the tissue in and around the tendon caused by overuse. Most experts now use the term tendinopathy to include both inflammation and microtears." WebMD, http://firstaid.webmd.com/tc/tendon-injury-tendinopathy-topic-overview. (last visited June 21, 2010).

[5]
Medial epicondylitis, also known as "Golfer's Elbow," occurs on the inside of the elbow, and is pain and inflammation at the site where forearm muscles attach to the elbow. The pain may spread to the forearm and wrist. MayoClinic.com, http://www.mayoclinic.com/health/golfers-elbow/ds00713. (last visited June 21, 2010).

[6]
Also known more generally as, 'fainting,' Syncope is "a temporary loss of consciousness due to a drop in blood flow to the brain. This episode is brief (lasting less than a couple of minutes) and is followed by rapid and complete recovery." Medline Plus, U.S. National Library of Medicine/ National Institutes of Health, http://www.nlm.nih.gov/medlineplus/ency/article/003092.htm (last visited June 21, 2010).

syndrome, and medial epicondylitis. (*Id.* at 103). Plaintiff was prescribed Paxil[7], Protonix[8], and Climara Pro Patch[9]. (*Id.*). Medical staff counseled Plaintiff to cease abusing drugs because it was likely contributing to her syncope. (*Id.* at 102-03).

On October 27, 2005, Plaintiff was seen by Daniel A. Wecht, M.D., for a neurosurgical evaluation. (*Id.* at 289). Plaintiff complained of severe pain in her neck and shoulder becoming progressively worse over the previous four to five months. (*Id.*). Plaintiff stated that she could not lower her right arm due to pain, that she experienced numbness and pain in her right arm and hand, and that physical therapy provided her no relief from pain. (*Id.*). Plaintiff told Dr. Wecht that she quit smoking, only drank occasionally, and did not use recreational drugs. (*Id.*). Dr. Wecht determined that Plaintiff was a well-developed female, grossly neurologically intact, with no acute distress. (*Id.* at 290). A subsequent MRI of Plaintiff's neck in October of 2005 revealed some disk abnormalities in Plaintiff's spine, but Dr. Wecht informed Plaintiff that the severity of her symptoms did not correlate with her MRI results. (*Id.*). Further tests were ordered. (*Id.*).

Dr. Wecht saw Plaintiff again on January 26, 2006, after further testing revealed some disk

---

[7]

Paxil, also known as "Paroxetine," is a "selective serotonin reuptake inhibitor (SSRI) used to treat depression, panic attacks, obsessive-compulsive disorder, anxiety disroders, post-traumatic stress disorder, and a severe form of premenstrual syndrome. SSRI's work by helping to restore the balance of certain natural substances in the brain." WebMD, http://www.webmd.com/drugs/mono-9095-PAROXETINE+-+ORAL.aspx?drugid=6968&drugname=Paxil+Oral&source=3 (last visited June 21, 2010).

[8]

Protonix, also known as "Pantoprazole," works "by blocking acid production in the stomach. This medication is know as a proton pump inhibitor. It is used to treat acid-related stomach and throat problems." WebMD, http://www.webmd.com/drugs/drug-18142-Protonix+Oral.aspx?drugid=18142&drugname=Protonix+Oral&source=1 (last visited June 21, 2010).

[9]

Climara Pro, also known as "Estradiol," is a "medication given to women who no longer produce the amount of female hormone (estrogen) they produced before menopause." WebMD, http://www.webmd.com/drugs/drug-78101-Climara+Pro+TD.aspx?drugid=78101&drugname=Climara+Pro+TD&source=1 (last visited June 21, 2010).

herniations and protrusions, for which Dr. Wecht suggested a 3-level diskectomy and fusion[10]. (*Id.* at 286). The surgery was performed on February 27, 2006. (*Id.*). At her one month follow up after the surgery, Plaintiff reported that the pain in her shoulder and upper right arm continued, and often felt worse than before the surgery. (*Id.* at 284). Dr. Wecht noted that imaging of the operative site showed good recovery. (*Id.* at 284, 364-65). He prescribed physical therapy and Flexeril[11] for muscle spasms, and set an appointment for two months later. (*Id.*).

### C. Medical Background - Psychological

On May 6, 2005, Plaintiff sought counseling at Mon Yough Community Services. (*Id.* at 168). Plaintiff complained of depression stemming from severe arm pain. (*Id.*). Omar Bhutta, M.D., the treating psychiatrist, recorded Plaintiffs symptoms of low energy, loneliness, anhedonia, feelings of hopelessness and helplessness, passive death wishes, and auditory hallucinations. (*Id.*). Plaintiff informed Dr. Bhutta that she used marijuana several times a week to relax, drank alcohol, and abused powder cocaine and crack cocaine. (*Id.*). Dr. Bhutta noted that Plaintiff was alert and oriented times three, had good eye contact, and had subdued affect. (*Id.* at 169). Dr. Bhutta also noted that Plaintiff had flashbacks of past abuse and borderline intellectual capacity. (*Id.*). Plaintiff was prescribed Elavil[12] and Paxil. (*Id.*). She was diagnosed as suffering from major depression[13], post traumatic

---

10

"Discectomy and fusion is a surgical procedure to remove a herniated or degenerative disc in the . . . spine. After the disc is removed, the vertebrae above and below the disc space are fused together." Mayfield, http://www.mayfieldclinic.com/PE-ACDF.htm (last visited June 21, 2010).

11

Flexeril, also known as "cyclobenzaprine," is "used along with rest and physical therapy to decrease muscle pain and spasms associated with strains, sprains or other muscle injuries." WebMD, http://www.webmd.com/drugs/drug-11372-Flexeril+Oral.aspx?drugid=11372&drugname=Flexeril+Oral (last visited June 21, 2010).

12

Elavil, also known as "Amitriptyline," is "used to treat mental/ mood problems such a depression. It may help improve mood and feelings of well-being, relieve anxiety and tension, help you sleep better, and increase your energy

stress disorder[14], and continuous polysubstance abuse, and was assessed a global assessment of functioning ("GAF") score of 50[15]. (*Id.*).

Plaintiff saw Dr. Bhutta again on May 25, 2005. (*Id.* at 179). At that visit, Dr. Bhutta completed a Medical Assessment of Ability to Do Work-Related Activities (Mental) Form for her SSI claim. (*Id.*). Dr. Bhutta gave Plaintiff a rating of "poor" in her ability to: (1) follow work rules; (2) relate to co-workers; (3) deal with [the] public; (4) use . . . judgment; (5) interact with

---

level. This medication belongs to a class of medications called tricyclic antidepressants. It works by affecting the balance of certain chemicals in the brain." WebMD, http://www.webmd.com/drugs/drug-1807-Elavil+Oral.aspx?drugid =1807&drugname=Elavil+Oral (last visited June 21, 2010).

[13]

"True clinical depression is a mood disorder in which feelings of sadness, loss, anger, or frustration interfere with everyday life for a long period of time. The exact cause of depression is not known. Many researchers believe it is caused by chemical imbalances in the brain." Symptoms may include agitation, change in appetite and weight, loss of concentration, fatigue, hopelessness or helplessness, feelings of worthlessness, inactivity and withdrawal from pleasurable activities, thoughts of death or suicide, and changes in sleep patterns. Medline Plus, U.S. National Library of Medicine/ National Institutes of health, http://www.nlm.nih.gov/medlineplus/ency/article/000945.htm (last visited June 21, 2010).

[14]

"Post traumatic stress disorder, PTSD, is an anxiety disorder that can develop after exposure to a terrifying event or ordeal in which grave physical harm occurred or was threatened. Traumatic events that may trigger PTSD include violent personal assaults, natural or human-caused disasters, accidents, or military combat. People with PTSD have persistent frightening thoughts and memories of their ordeal and feel emotionally numb. They may experience sleep problems, feel detached or numb, or be easily startled." National Institutes of Health/ National Institute of Mental Health, http://www.nimh.nih.gov/health/topics/post-traumatic-stress-disorder-ptsd/index.shtml (last visited June 21, 2010).

[15]

The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." A GAF score of between 31-40 denotes "severe symptoms" with some impairment in reality testing or major impairments in several areas. American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed.2000). An individual with a GAF score of 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 50 may have "[s]erious symptoms (e.g., suicidal ideation ....)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood"; of 30 may have behavior "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., ... suicidal preoccupation)" or "inability to function in almost all areas ...; of 20 "[s]ome danger of hurting self or others ... or occasionally fails to maintain minimal personal hygiene ... or gross impairment in communication...." *Id.*

supervisors; (6) deal with work stress; (7) function independently; (8) maintain attention/ concentration, (9) understand, remember, and carry out complex job instructions; and (10) understand, remember, and carry out detailed, but not complex job instructions. (*Id.* at 179-181). She was rated as "fair" with respect to her ability to "understand, remember, and carry out simple job instructions." (*Id.*). Dr. Bhutta diagnosed Plaintiff with major depression due to a medical condition and polysubstance abuse, and assessed a GAF score of 50. (*Id.* at 180, 182).

In the May 25 evaluation, Dr. Bhutta also noted that Plaintiff had poor memory, appetite disturbance, sleep disturbance, mood disturbance, emotional lability, hallucinations, anhedonia[16], psychomotor agitation, feelings of guilt and worthlessness, difficulty thinking and concentrating, decreased energy, and flashbacks of traumatic experiences. (*Id.* at 180). Dr. Bhutta indicated that Plaintiff did not suffer from oddities of thought, perception, speech, or behavior, perceptual disturbances, social withdrawal or isolation, blunt, flat, or inappropriate affect, or obsessions and compulsions. (*Id.*). Dr. Bhutta then equivocally noted that despite Plaintiff's psychological limitations, she could work a normal work day and week, but had no capacity to work. (*Id.* at 180, 182). No further explanation was provided.

In total, Plaintiff was scheduled to meet with Dr. Bhutta eight times, but only appeared for six appointments. (*Id.* at 168-70, 180-182, 276-83). In the four remaining sessions with Dr. Bhutta that Plaintiff attended, Dr. Bhutta's diagnosis and GAF assessment remained the same, although he seemed to report an increase in hallucinations and delusions. (*Id.* at 276-83).

State psychologist Sharon Becker Tarter, PhD, conducted a psychological file examination

---

[16]

Anhedonia is defined as the "[a]bsence of pleasure from the performance of acts that would ordinarily be pleasurable." WebMD, http://dictionary.webmd.com/terms/anhedonia (last visited June 21, 2010).

of Plaintiff's medical records for SSI purposes on August 2, 2005. (*Id.* at 191). Dr. Tarter determined that Plaintiff suffered from major depression, post traumatic stress disorder, and behavioral changes or physical changes associated with the regular use of substances that affect the central nervous system. (*Id.* at 194, 196, 199). Dr. Tarter noted that Plaintiff was only mildly restricted in activities of daily living, moderately restricted in social functioning, moderately limited in maintaining persistence, concentration, or pace, and not affected by episodes of decompensation. (*Id.* at 201). She further found that Plaintiff was otherwise only moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, interact appropriately with the public, accept instructions, respond to criticism from supervisors, and respond appropriately to changes in work setting. (*Id.* at 204-05). Dr. Tarter found Plaintiff's claims regarding her mental infirmities to be only partially credible, and determined Plaintiff was able to meet the basic demands of competitive work on a sustained basis despite her limitations. (*Id.* at 206).

Following a fire that destroyed her apartment, and a subsequent move to her daughter's home, Plaintiff again sought treatment at Chestnut Ridge beginning November 29, 2006. (*Id.* at 272). (She had previously been treated by Chestnut Ridge from 1999 through 2004. (*Id.* at 282)). At intake, a clinician reported that Plaintiff claimed to be suffering from worsening auditory hallucinations, including hearing babies crying and people calling her name, and that she was depressed and anxious. (*Id.*). Plaintiff stated that she last took prescribed medications in May of 2006, and abused drugs and alcohol in the past. (*Id.*). The clinician indicated that Plaintiff suffered from major depression, anxiety, schizophrenia[17], and drug abuse, and assessed a GAF of 40. (*Id.*).

---

[17] "Schizophrenia is a chronic, severe, and disabling brain disorder that affects about 1.1 percent of the U.S. population age 18 and older in a given year. Symptoms . . . can include hallucinations, delusions, disordered thinking, movement disorders, flat affect, social withdrawal, and cognitive deficits." National Institute of Mental Health/ National

On December 13, 2006, William Ryan, M.D., treated Plaintiff at Chestnut Ridge. (*Id.* at 266). Plaintiff claimed to suffer from auditory hallucinations and bad thoughts. (*Id.*). Dr. Ryan believed Plaintiff's complaints were simply a rehearsed list of symptoms of auditory hallucinations. (*Id.* at 271). Plaintiff described a difficult childhood and relationships that resulted in verbal and physical abuse. (*Id.* at 267). Dr. Ryan noted that during the session, Plaintiff was well oriented, alert, and fully cooperative. (*Id.*). Indeed, Plaintiff brought her granddaughter to the session at Chestnut Ridge. (*Id.* at 266). Dr. Ryan observed Plaintiff caring for her young granddaughter and noted that she managed parental duties easily and with minimal stress. (*Id.* at 267). The doctor reported that Plaintiff showed no impairment of concentration, comprehension, or attention, and that she spoke rationally and coherently. (*Id.*). Dr. Ryan noticed below average intellect, but observed appropriate affect, good eye contact, relevant responses, excellent reality contact, and an overall positive rapport. (*Id.*). Plaintiff's memory was precise, but Dr. Ryan noted a vagueness in the description of Plaintiff's life for approximately 14 years prior to Plaintiff moving in with her daughter. (*Id.*). Dr. Ryan diagnosed Plaintiff as suffering from depression and substance abuse, assessed a GAF of 60, and prescribed Geodon[18] for treatment. (*Id.* at 268). Plaintiff had two more appointments with Dr. Ryan, the first of which Plaintiff did not attend. (*Id.* at 271). After the second appointment, on January 26, 2007, Dr. Ryan recorded no changes in Plaintiff's condition. (*Id.*).

On May 7, 2007, Plaintiff's primary care physician, Dominic DiLeo, M.D., completed and

---

Institutes of Health, http://www.nimh.nih.gov/health/topics/schizophrenia/index.shtml (last visited June 21, 2010).

[18]

Geodon, also known as "Ziprasidone," is "used to treat certain mental/ mood disorders (schizophrenia or manic/ mixed episodes associated with bipolar disorder). It may be used after other medications have not been effective. This medication can make you feel less nervous and improve your concentration. It helps you think more clearly and take a more active part in everyday life." WebMD, http://www.webmd.com/drugs/drug-20575-Geodon+Oral.aspx?drugid =20575&drugname=Geodon+Oral (last visited June 21, 2010).

signed a Pennsylvania Department of Public Welfare Employment Assessment Form for Plaintiff. (*Id.* at 264-65). On the form, Dr. DiLeo indicated that Plaintiff was schizophrenic and suffering from bipolar depression[19], and was permanently disabled for purposes of SSI. (*Id.*). Nothing more is listed except for a brief statement by Plaintiff. (*Id.*).

### D. Administrative Hearing

Plaintiff appeared at her hearing before the ALJ with her legal counse,l Robert Gilliken, Esq. Also present at the hearing was a vocational expert, Fred Monaco, M.D.[20] (*Id.* at 370). The ALJ began by questioning Plaintiff about her medical history. Plaintiff explained that she had pain in both shoulders, both arms, her left elbow, lower back, upper back, and neck. (*Id.* at 375). Plaintiff described her physical medical conditions as tendonitis in the left and right arm, and a torn rotator cuff. (*Id.*). Plaintiff also claimed to have back spasms and arthritis in the left leg. (*Id.*). Plaintiff explained that she was receiving psychological treatment at Chestnut Ridge with a therapist once a month, and was taking medications. (*Id.* at 376).

Plaintiff's attorney asked Plaintiff how often she went to see Dr. Bhutta at Mon Yough, to which Plaintiff replied that she saw the doctor twice a month for schizophrenia, depression, and anxiety. (*Id.* at 377). Since December of 2006, Plaintiff also claimed to have been seeing Dr. Ryan for continuing treatment. (*Id.*). Plaintiff's attorney turned to Plaintiff's hallucinations, and asked Plaintiff to describe same. (*Id.* at 378). Plaintiff described her hallucinations as voices screaming

---

[19]

"Bipolar Disorder, also known as manic-depressive illness, is a serious medical illness that causes shifts in a person's mood, energy, and ability to function." National Institute of Mental Health/ National Institutes of Health, http://www.nimh.nih.gov/health/topics/bipolar-disorder/index.shtml (last visited June 21, 2010).

[20]

Dr. Monaco's curriculum vitae is not filed of record. However, at the administrative hearing, Plaintiff's counsel stipulated to his qualifications as a vocational expert and the ALJ found him to be qualified. (R. at 379).

her name, visions of people walking towards and away from her, and inexplicable sensations and smells. (*Id.*).

After questioning Plaintiff, the ALJ turned to the vocational expert. Dr. Monaco testified regarding what types of work may be available for an individual suffering ailments similar to Plaintiff's, and of the same age, educational level, and work history. (*Id.* at 379). Based upon the Plaintiff's aforementioned medical history, the ALJ asked Dr. Monaco to state what jobs, if any, were available to a person similarly situated to Plaintiff, with a GAF score of 60, and limited to sedentary work with no foot or pedal controls and no reaching above shoulder height, in a low stress environment with only simple, routine, repetitive tasks, and with only minimal contact with the public. (*Id.* at 379-80).

Dr. Monaco replied that Plaintiff could work in one of 160,000 sedentary positions in the national economy, akin to bench assembly - individual assembly of various small products. (*Id.*) Plaintiff would also qualify for 26,000 sedentary positions in the national economy similar to abrasive machine operation, wherein the Plaintiff would perform grinding, filling, and polishing. (*Id.*). In his opinion, 28,000 sedentary jobs in the national economy also available to Plaintiff would be hand working occupations involving cutting, trimming, and molding. (*Id.*). Plaintiff's counsel later asked Dr. Monaco whether the ALJ's hypothetical person, similarly situated to Plaintiff in all respects except that his or her GAF score was 50 instead of 60, could perform the jobs Dr. Monaco had earlier described. (*Id.*). Dr. Monaco stated that a GAF of 50 would preclude the hypothetical person from performing the described jobs - he or she "could not work." (*Id.*).

### E. Opinion of the ALJ

In denying Plaintiff's claim for SSI benefits, the ALJ found that:

1. The [Plaintiff] has not engaged in substantial gainful activity since March 16, 2005, the application date;

2. The [Plaintiff] has the following severe impairments: spondylosis[21] and stenosis[22] of the cervical spine, status post fusion surgery; rotator cuff tendonitis[23] of the left shoulder; and major depressive disorder;

3. The [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4. After careful consideration of the entire record, the undersigned finds that the [Plaintiff] has the residual functional capactiy to perform sedentary work, except that she cannot operate foot controls and cannot reach above shoulder level. She is limited to simple, repetitive tasks involving minimal public contact and relatively low stress;

5. The [Plaintiff] has no past relevant work;

6. The [Plaintiff] was born on March 25, 1960 and was 45 years old, which is defined as a younger individual age 45-49, on which the date of the application was filed;

7. The [Plaintiff] has a high school education and is able to communicate in English;

8. Transferability of job skills is not an issue because the [Plaintiff] does not have past relevant work;

9. Considering the [Plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [Plaintiff] can perform; and

10. The [Plaintiff] has not been under a disability, as defined in the Social Security Act, since March 16, 2005, the date the application was filed.

---

[21]

"Cervical spondylosis is a general term for age-related wear and tear affecting the disks in your neck. Many people with signs of cervical spondylosis . . . on x-rays manage to escape associated symptoms, which include pain, stiffness and muscle spasms. When symptoms do occur, nonsurgical treatments often are effective." MayoClinic.com, http://www.mayoclinic.com/health/cervical-spondylosis/ds00697 (last visited June 21, 2010).

[22]

"Spinal stenosis is a narrowing of one or more areas in your spine - most often in your neck or lower back. This narrowing can put pressure on the spinal cord or spinal nerves at the level of compression. Depending on which nerves are affected, spinal stenosis can cause pain or numbness in your legs, back, neck, shoulders, or arms; limb weakness and incoordination; loss of sensation in your extremities; and problems with bladder and bowel function. Pain is not always present, particularly if you have spinal stenosis in your neck." MayoClinic.com, http://www.mayoclinic.com/health/spinal-stenosis/ds00515 (last visited June 21, 2010).

[23]

"Rotator cuff tendonitis is an inflammation (irritation and swelling) of the tendons of the shoulder." Symptoms include pain when moving the arm and weakness or pain when moving the arm over the head. Medline Plus, U.S. National Library of Medicine/ National Institutes of Health, http://www.nlm.nih.gov/medlineplus/ency/article/000438.htm (last visited June 21, 2010).

(R. at 13-20).  Generally, the ALJ gave greater weight to the opinions of Dr. Ryan, in contrast to Dr. Bhutta, and relied primarily upon Dr. Ryan's findings when denying Plaintiff SSI benefits.  At several points in his opinion, the ALJ provided his reasons for favoring Dr. Ryan's findings, stating that Plaintiff's clearly documented substance abuse and failure to maintain her prescribed regimen of medications while seeing Dr. Bhutta likely skewed his perception of Plaintiff's actual limitations. (*Id.* at 14, 17-18).  The ALJ considered the recency of Dr. Ryan's treatment of Plaintiff, as opposed to Dr. Bhutta's treatment, to be an important factor while citing primarily to Dr. Ryan's findings. (*Id.*).  In addition, the ALJ noted Plaintiff's history of being less than candid with medical professionals during physical and psychological treatments. (*Id.*).  Dr. Ryan's ability to identify Plaintiff's lack of candor when she provided a "rehearsed" list of symptoms during treatment, also lent Dr. Ryan's medical opinions greater credibility in the ALJ's mind. (*Id.*).

**V. DISCUSSION**

In her Motion for Summary Judgment, Plaintiff attacks the ALJ's determination as to her mental health limitations, only, and not as to her physical limitations. (Docket No. 11 at 2).  Plaintiff alleges that the ALJ erred by failing to give proper weight to Plaintiff's specific mental health limitations identified by Dr. Bhutta, Plaintiff's claims of auditory hallucinations, and certain of Plaintiff's GAF scores. (*Id.*).  As a result of these failures, Plaintiff argues that the ALJ's hypothetical to the vocational expert and residual functional capacity assessment were not supported by substantial evidence, and were an improper basis for rejecting Plaintiff's SSI claim. (*Id.*). According to Plaintiff, had these errors not been made, she would be entitled to SSI benefits. (*Id.*). The Defendant maintains that the ALJ's findings and determinations are sufficiently supported by

the record. (Docket No. 13 at 14).

In light of the ALJ's failure to cite sufficient evidence in the medical record to contradict the limitations found by Dr. Bhutta, and as a result of the failure of the ALJ to explain the reasoning behind crediting Dr. Ryan's GAF assessment of 60 in comparison to Dr. Bhutta's GAF assessment of 50 and Chestnut Ridge's GAF assessment of 40, the Court will remand the case to the ALJ for further consideration. However, the Court finds that the ALJ properly provided evidence to contradict claims of auditory hallucinations.

### A. Weight of Physicians' Opinions

Plaintiff's main allegations of error on the part of the ALJ generally center around the ALJ giving greater weight to the medical opinions of Dr. Ryan rather than those of Dr. Bhutta - both identified as treating physicians - with respect to Plaintiff's psychological impairments. (Docket No. 11 at 9, 11, 13; R. at 14). In general, a treating physician's opinions may be entitled to great weight - considered conclusive unless directly contradicted by evidence in a claimant's medical record - particularly where the physician's findings are based upon "continuing observation of the patient's condition over a prolonged period of time." *Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 355 (3d Cir. 2008); *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (citing *Rocco v. Heckler* 826 F.2d 1348, 1350 (3d Cir. 1987)). However, a showing of contradictory evidence and an accompanying explanation will allow an ALJ to reject a treating physician's opinion outright, or accord it less weight. *Id.*

While it is not expected that the ALJ's explanation match the rigor of "medical or scientific analysis" a scientist might provide in justifying his or her decisions, it is expected that when rejecting a treating physician's findings or according such findings less weight, the ALJ will be as

"comprehensive and analytical as feasible," and provide the factual foundation for his decision and the specific findings that were rejected. *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981). The explanation should allow a reviewing court the ability to determine if "significant probative evidence was not credited or simply ignored." *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001). The ALJ "cannot reject evidence for no reason or for the wrong reason." *Morales v. Apfel*, 255 F.3d 310, 317 (3d Cir. 2000) (citing *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993)). Moreover, the ALJ "should not substitute his lay opinion for the medical opinion of experts," or engage in "pure speculation" unsupported by the record. *Id.* at 318-19; *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984).

### B. Assessment of RFC and Findings of Dr. Bhutta

Plaintiff objects to the ALJ's determination of her disability claim, alleging that the ALJ did not properly consider and discuss Plaintiff's psychological limitations as identified by Dr. Bhutta. (Docket No. 11 at 10, 14). Plaintiff also argues that the ALJ's assessment of Plaintiff's residual functional capacity ("RFC") was contrary to the weight of the evidence, and the hypothetical question posed to the vocational expert was inaccurate. (*Id.*).

"'Residual functional capacity'[RFC] is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v. Commissioner of Social Security*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)). A claimant's RFC represents the most, not the least, that a person can do despite his or her limitations. *See Cooper v. Barnhart*, Civ. A. No. 06-2370, 2008 WL 2433194, at *2 n.4 (E.D.Pa., June 12, 2008) (citing 20 C.F.R. § 416.945(a)). In determining a claimant's RFC, an administrative law judge must consider all evidence of record and the claimant's subjective

complaints and statements concerning his limitations. 20 C.F.R. §§ 404.1545(a), 416.945(a), and 416.920.

Although an administrative law judge can weigh the credibility of the evidence when making a RFC determination, he or she must give some indication of the evidence which is rejected and the reasons for doing so. *Id.* As the Court of Appeals held in *Burnett*, "'[i]n the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'" *Id.* at 121 (quoting *Cotter,* 642 F.2d at 705). However, the determination of disabled status for purposes of receiving SSI - a decision reserved for the Commissioner, only - will not be affected by a medical source simply because it states that a claimant is "disabled," or "unable to work." 20 C.F.R. § 416.927(e).

Plaintiff focuses her argument upon Dr. Bhutta's opinion regarding her mental limitations, and claims that because the ALJ did not address these limitations at length, the ALJ failed to properly consider all pertinent information when making his decision. (Docket No. 11 at 14). Plaintiff maintains that Dr. Bhutta identified, and the ALJ allegedly ignored, Plaintiff's limited ability to:

- Follow work rules;
- Relate to coworkers;
- Deal with [the] public;
- Use . . . judgment;
- Interact with supervisors;
- Deal with work stress;
- Function independently;
- Maintain attention/ concentration;
- Understand, remember, and carry out complex job instructions; and
- Understand, remember, and carry out detailed, but not complex, job instructions.

(*Id.* at 15). The ALJ also allegedly failed to account for Dr. Bhutta's determination that Plaintiff had "no capacity to work." (*Id.* at 10).

A portion of the ALJ's hypothetical question to the vocational expert dealt with Plaintiff's mental limitations, specifically an individual with a GAF of 60, requiring a low stress environment, wherein said individual would not have more than minimal contact with the public, and performs only simple, routine, repetitive tasks. (R. at 380). In his decision, the ALJ found that in light of Plaintiff's age, education, work experience, and RFC assessment mirrored by his hypothetical to the vocational expert, there were significant numbers of jobs in the national economy that the claimant could perform, and therefore, Plaintiff was not disabled. (R. at 19).

With respect to the proper consideration of all pertinent evidence in Plaintiff's medical record - specifically Dr. Bhutta's medical notes - the ALJ failed to explicitly discuss each of Dr. Bhutta's findings and provide sufficient contradictory evidence from the medical record to justify not encompassing the limitations in his hypothetical or RFC assessment. (R. at 14-15, 17-20). Instead, the ALJ relied upon Dr. Ryan's therapy notes and his own credibility judgments to justify the denial of SSI to Plaintiff. (*Id.*; R. at 266-69, 271). The ALJ made little mention of Dr. Bhutta's findings, ignored Dr. Bhutta's more extensive treatment history, and did not address the apparent lack of specifically enumerated findings by Dr. Ryan which would contradict certain of Dr. Bhutta's identified limitations. (*Id.*). As a result, this Court cannot determine if significant probative evidence was not credited or simply ignored.

The ALJ referred to Dr. Bhutta and Dr. Ryan both as treating physicians. (*Id.* at 14). The ALJ must then, in as comprehensive a manner as possible, provide his reasons for discrediting or according lesser weight to Dr. Bhutta's conclusions, including the findings being rejected and the

20

underlying support in the medical record. *Cotter*, 642 F.2d at 705; *see also Morales*, 225 F.3d 317-18 ("Although an ALJ may consider his own observations of the claimant . . . they alone do not carry the day and override the medical opinion of a treating physician that is supported by the record. The ALJ cannot . . . disregard . . . medical opinion based solely on his own 'amorphous impressions, gleaned from the record and from his evaluation of . . . credibility.'"). Contradictory evidence and an accompanying explanation is expected to be provided by the ALJ to justify his position. *Brownawell*, 554 F.3d at 355; *Plummer*, 186 F.3d at 429; *see Fargnoli*, 247 F.3d at 42-43 ("Where there is conflicting probative evidence in the record, we recognize a particularly acute need for an explanation of the reasoning behind the ALJ's conclusions, and will vacate or remand a case where such an explanation is not provided.").

While Dr. Bhutta may have indicated that the Plaintiff had both "no capacity to work," and the capacity to work an average workweek, the ALJ must provide factual support from the record for according one of Dr. Bhutta's determinations greater weight than another of his determinations. (R. at 180-182); *Cotter*, 642 F.2d at 705. When resolving inconsistencies in the record - such as conflicting findings by the same doctor regarding ability to work - it is the ALJ's job to weigh the record as a whole to determine what evidence is credible. 20 C.F.R. § 416.927(c)(2); *Cotter*, 642 F.2d at 705; *Drejka v. Commissioner of Social Security*, 61 Fed. Appx. 778, 781 (3d Cir. 2003); *see Lyons v. Barnhart*, Civ. A. No. 04-5094, 2006 WL 401848 at 2 (E.D. Pa. 2006) (according lesser weight to a treating physician's opinion on disability due to internal inconsistency, as well as record as a whole, was appropriate). However, the ALJ failed to discuss the internal inconsistency in any manner, denying this Court the opportunity to determine if evidence was discredited for improper reasons, or if the ALJ's conclusion was supported by substantial evidence. Therefore, this issue must

be remanded for further consideration.

### C. Assessment of Auditory Hallucinations

Plaintiff's second objection to the ALJ's determination of her disability claim is that the ALJ failed to properly consider Plaintiff's "significant evidence" of auditory hallucinations. (Docket No. 11 at 11). Once again, the ALJ adopts the findings of Dr. Ryan over those of Dr. Bhutta. The Plaintiff claims this was error on the ALJ's part; however, the ALJ's discussion of his reasoning appears to be adequately supported by the facts of record, and therefore, meets the substantial evidence test.

It has been held that the ALJ is the party best situated to make credibility determinations, and for this reason is given deference as the fact-finder - particularly with respect to testimony and allegations made by a claimant. *Drejka*, 61 Fed. Appx. at 781-82. However, "[a]lthough allegations of pain and other subjective symptoms must be consistent with objective medical evidence, the ALJ must still explain why he is rejecting the testimony." *Burnett*, 220 F.3d at 122.

In justifying his decision, the ALJ first noted that the Plaintiff was clearly abusing illicit drugs while seeing Dr. Bhutta, and that this likely affected Plaintiff's cognitive functioning and resulted in Dr. Bhutta's consistent finding that Plaintiff suffered from hallucinations. (R. at 17, 168-70, 180-82, 276-83). The ALJ noted secondly that Dr. Ryan believed Plaintiff's description of her hallucinations to be a "rehearsed list," and in conjunction with a history of being less than candid with medical staff, and having appeared less than credible to the ALJ during the SSI hearing, the ALJ found that Dr. Ryan's findings were likely the most reliable and accurate. (R. at 17-18, 267-71). Finally, the ALJ opined that there was no evidence to suggest that medication prescribed by Dr. Ryan

failed to control Plaintiff's alleged symptoms. (R. at 17-18). This explanation is supported by substantial evidence, as evidence contrary to Plaintiff's claim was adduced from the record and reliance upon it was explained.

### D. Assessment of GAF Scores

Plaintiff's third objection to the ALJ's determination of her disability claim is that the ALJ erred in failing to give consideration to GAF scores of 40 and 50 received over the course of various psychological evaluations. (Docket No. 11 at 12). As with Dr. Bhutta's determination of Plaintiff's limitations, the ALJ failed to present adequate factual support for his favoring Dr. Ryan's GAF of 60 over Dr. Bhutta's score of 50, and therefore, the ALJ's decision is not supported by substantial evidence.

Similar to findings by treating physicians, a GAF score may be disregarded or accorded little weight depending upon its consistency with the claimant's record as a whole. *Torres v. Barnhart*, 139 Fed. Appx. 411, 415 (3d Cir. 2005). Where the GAF is inconsistent or unsupported by the physician's other findings, or appears to be an inaccurate indication of present mental impairment due to inconsistency with the whole record, an ALJ is justified in rejecting a GAF score. *Id.*

The ALJ acknowledged that a GAF of 50 would not be compatible with successful employment in Plaintiff's case. (R. at 20). Yet, the ALJ rejected the GAF of 50 because he believed that Dr. Bhutta's reports were influenced by the Plaintiff's drug abuse and failure to maintain her prescribed drug regimen. (*Id.*; R. at 168-70, 180-82, 276-83). The GAF score was also described by the ALJ as only a "snapshot" assessment with little analytical value when assessing an individual's RFC over time. (R. at 20). However, the ALJ relied upon the GAF of 60 in his hypothetical and opinion denying SSI benefits despite his disapproval of GAF scores, and in spite of the GAF score

of 50 obtained by Dr. Bhutta over the course of year-long treatment, instead of one visit with Dr. Ryan. (R. at 20). The ALJ did not provide sufficiently specific reasons for supporting a GAF of 60 and rejecting a GAF of 50. (*Id.*). The ALJ also completely failed to account for a GAF of 40. (*Id.*). Given that these scores contradict one another, the ALJ had an obligation to thoroughly discuss favoring one score over another, and failed to do so. *Brownawell*, 554 F.3d at 355; *Plummer*, 186 F.3d at 429. The use of the GAF of 60 was not properly shown to be supported by substantial evidence in this case. Therefore, for this and the other reasons outlined above, this matter must be remanded for further clarification in accord with this decision.

## VI. CONCLUSION

Based upon the foregoing: (1) Defendant's Motion for Summary Judgment is denied; (2) Plaintiff's Motion for Summary Judgment is granted; and (3) the case is REMANDED for further consideration. An appropriate Order follows.

*s/Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Dated: June 22, 2010
cc/ecf: All counsel of record.